# CIRCUIT COURT OF BALTIMORE CITY.

Filed April 28, 1908.

CHARLES W. LORD
VS.
HARRY W. SMITH.

*J. Kemp Bartlett* and *W. S. Bansemer* for the plaintiff.

*William A. Wheatley* for the defendant.

PHELPS, J.—

Prior to 1893 the plaintiff had been prominent among the enterprising and prosperous merchants of Baltimore. About that time he became unfortunate in business, and financially embarrassed, so that he felt himself compelled to make an assignment to trustees of his individual property. The assets of the firm in which he was a partner were placed in the hands of receivers.

Such being the state of his affairs, the plaintiff was anxious to resume business and in order as he supposed to facilitate that object devised and carried into effect the scheme out of which has grown the present litigation.

It so happened that a number of years before he had taken into his employ a lad who grew to be a man in his service, and in whom the plaintiff had the most unlimited confidence. That person was Smith, the defendant.

The scheme referred to was simply this:

According to the plaintiff's own statement he readily secured the defendant's consent to an arrangement by means of which the plaintiff's bank account was to be kept in the name of the defendant, and the insurance upon the plaintiff's stock was to be effected in the defendant's name.

Neither in his bill of complaint nor in his sworn testimony is there the slightest attempt on the part of the plaintiff to disguise the fact that his object, and his only object, in making this arrangement was to conceal from his creditors, and to protect from their possible pursuit the assets thus transferred by him to the defendant.

On the other hand, the arrangement is positively denied by the defendant, whose claim is, in fact, that his possession and control of these assets has been all along under an absolute title to ownership, and not in virtue of any such secret trust as that indicated by the plaintiff.

No further notice will be taken of this contradiction since it is obvious that in estimating, as we shall presently have occasion to do, the merits and the quality of the plaintiffs conduct, he must be taken at his own word.

From what has already been said, it will be easily perceived what must necessarily be the main line of defence to a bill virtually claiming recovery of these assets and their restoration to the plaintiff's possession. The transfer of a debtor's assets to a third person, for the purpose, and with the intent of hindering, delaying and defrauding creditors, has long since become one of the stock illustrations of the well-worn maxim—"He who comes into equity must come with clean hands."

It is not deemed necessary to attempt a review of the long line of authorities, to which the jurisprudence of Maryland has been a generous contributor, in which the maxim and this illustration of it have been recognized and enforced. Freeman vs. Sedwick, 6 Gill, 29; Roman vs. Mali, 42 Md., 562; Schuman vs. Peddicord, 50 Md., 562; Brown vs. Riley, 72 Md., 489.

Unquestionably the most remarkable of these cases is that of Roman vs. Mali, 42 Md., 574, and with respect to this case it may be worth while to offer one or two observations.

Learned counsel for the plaintiff are clearly right in arguing that the case in hand falls very far short of presenting those aggravated and extreme circumstances of flagrant fraud upon creditors which characterized the flagitious dealings between Roman and Mali. But the question in all such cases is not whether the debtor has sounded the deepest depths of iniquity, but whether he has intentionally transferred his assets in such wise as to hinder, delay or defraud his creditors.

Another point of view may be taken of this celebrated case, which presents a sharp contrast with the case at bar.

The great difficulty found by the judges in Roman vs. Mali, and which, after much conference and discussion, resulted in a final division of the Court of Appeals, was a difficulty from which this case is altogether free.

The trouble in that case arose from the alleged inequality between the parties, Roman, the fraudulent grantee, having been Mali's professional adviser, suggesting and engineering the scheme. Hence it was claimed that the parties were not *in pari delicto*, and that therefore the maxim in question did not apply. The contrary view, however, was the one which finally prevailed.

On the other hand, the contrivance of the scheme in this case was a matter with which the defendant had absolutely nothing to do.

As already seen, it was wholly the invention of the plaintiff, and the defendant's part in it was simply that of passive acquiescence. And so far from there being any such inequality as placed the defendant in a position of influence or advantage over the plaintiff the inequality was altogether the other way.

As the defendant's patron and employer from boyhood, the plaintiff may be presumed to have acquired over him all that commanding influence and authority which such a relation ordinarily

imports, and all the testimony is consistent with that view.

In the able argument of the plaintiff's counsel, the application of the maxim in question to the facts of this case was strenuously resisted on several grounds.

It is contended that the maxim does not apply where there is no "moral turpitude," and in the same connection it is argued that the creditors have not been, in fact, injured, and that they are not heard complaining.

But it has been decided that it is not necessary that there should be an "actual intent on the part of the grantor to perpetrate a fraud. If the necessary effect and operation of the instrument be to hinder and defraud creditors, the legal presumption is that it was for that purpose."

"Notions of right and wrong vary, of course, with each individual person, and in declaring that every one must intend the legal consequences of his own voluntary act, the law provides a more certain and reliable standard by which the intention is to be ascertained," Schuman vs. Peddicord, 50 Md., 563.

"It has been said that the maxim refers to wilful misconduct (citing Lewis' Appeal, 67 Pa. St., 153), but this can mean no more than free and deliberate action, with knowledge of the facts. It does not require consciousness of the illegal or immoral nature of the act." 16 Cyc. 149, and cases cited.

And again, as to creditors not being injured.

"That he has since paid his creditors does not alter the question. He intended to hinder and delay them, and the character of his act must be determined by the circumstances which existed when the act was done." Brown vs. Reilly, 72 Md., 492. With respect to the objection that the illegal transaction was merely "collateral," it is only necessary to refer to the seventh paragraph of the plaintiff's bill where that transaction is distinctly relied on as fundamental.

The remaining objection is an attempt to confound this case with an altogether distinct line of cases, of which Brooks vs. Martin, 2 Wall., 79, is the type. In that case it was held by a majority of the Supreme Court,

over the vigorous dissent of Justice Catron, that partners who had made money by a course of illegal dealings and who had fallen out over the plunder would nevertheless be assisted by a Court of Equity in making a division after the illegal business was finished and the resulting proceeds had been investigated in land, notes, mortgages, etc. The illegal transactions had become "accomplished facts and could not be affected by any action which the Court might take."

While it cannot be claimed that the case in 2 Wall., has been distinctly overruled, its authority as a precedent, except upon a state of facts precisely identical, has been materially impaired, if not altogether destroyed.

Say the Supreme Court, "taking the case into due and fair consideration, we will not extend its authority at all beyond the facts therein stated." McMullen vs. Hoffman, 174 U. S., 668.

To pursue further the discussion of this case of Brooks vs. Martin, 2 Wall., 79, and of the English decision on which is is avowedly founded, of Lord Chancellor Cottenham, in Sharp vs. Taylor, 2 Phil. Chan., 801, would unduly extend this opinion.

It will simply be suggested to those who may be interested in the investigation that a very careful and thorough treatment of the subject may be found in a decision of this Court, reported in The Daily Record of May 11, 1889, under the name of Prunty vs. Basshor, cited Brantly Contracts, page 156, note 4.

Before parting company with Brooks vs. Martin, it will be in order to make a single observation. Allowing to that case all the authority that can possibly be claimed for it, where, it may be asked is the analogy in principle with the case at bar? No such analogy was pointed out by learned counsel for plaintiff, either in their oral argument, or in their able and elaborate brief.

The defence in this case as in all similar cases is a discreditable one, and Courts only find themselves compelled to allow parties the advantage of such defences with reluctance and regret.

In the language of Lord Mansfield, so often cited in this connection that it has become a legal classic: "The objection that a contract is immoral or illegal as between plaintiff and defendant sounds at all times very ill in the

538

mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded on general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff. No Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. It is upon this ground that the Court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff." Holman vs. Johnson, Cowper, 343.

"The defence is allowed, not for the sake of the defendant, but of the law itself." Coppell vs. Hull, 17 Wall., 558, 103 U. S., 268.

After a continuous service of more than twenty-five years, this is the last case, either at law or in equity, that I shall be called upon to decide. The trial of the case occupied the Court for more than a mouth, and required, or rather involved, the taking of a thousand pages of oral testimony, besides documentary evidence, and the collection of a vast mass of exhibits.

In conclusion it only remains to express the acknowledgments of the Court to the learned counsel on both sides for their uniform courtesy to the Court and to each other and to the witnesses, while watchful and zealous to the last degree of the interests of their respective clients. Also for the painstaking industry and marked ability displayed both in the preparation, trial and argument of the case.

In the view taken, the testimony excepted to on either side becomes immaterial.

A decree has been passed dismissing the bill.